NICHOLS & COX LUMBER CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.   April 7, 1914.)

No. 2409.

1. STATUTES (§ 161*)—IMPLIED REPEAL.

The principle that where a later act embraces a whole subject it supplants an earlier act dealing with such subject does not avoid the rule that repeals by implication are not favored.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 230–234; Dec. Dig. § 161.*]

2. CARRIERS (§ 23*)—REBATES—IMPLIED REPEAL.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 10, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3160), as amended by Act June 18, 1910, c. 309, § 10, 36 Stat. 549 (U. S. Comp. St. Supp. 1911, p. 1293), making it an offense to offer, grant, give, or solicit, accept, or receive a rebate from a carrier for the transportation of goods in interstate commerce, and prohibiting the shipper from obtaining, or attempting to obtain, by false statement or representation as to cost, value, nature, or extent of injury, or by the use of any false bill, bill of lading, receipt, etc., any allowance, refund, or payment for damages, or otherwise, was not repealed by implication by Hepburn Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (U. S. Comp. St. Supp. 1911, p. 1289), making it an offense to obtain interstate transportation at less than tariff rates by false billing, false classification, false weighing, or false report of weight, etc.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 57–59; Dec. Dig. § 23.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Com'n Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

3. CARRIERS (§ 32*)—INTERSTATE COMMERCE—REBATES—TRANSIT PRIVILEGE.

Where lumber comprised in two shipments was sold and consumed at the transit point, and that contained in a third inbound shipment was reconsigned at the transit point to another city in the state, so that the objects, as well as the shipments, were fully accomplished at the transit point, an application of transit rates to such shipments which were lower than the local rates applicable thereto constituted rebating.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

4. CARRIERS (§ 38*)—OFFENSES—ACCEPTING REBATES—ACTS OF AGENT.

Where transit rates were applied by an interstate railroad company to certain shipments of lumber which were not entitled thereto, and some of the agents of defendant corporation knew what was done with the inbound lumber, and that the shipments were not entitled to such rates, defendant was chargeable with their knowledge, and was subject to prosecution for accepting a rebate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

5. CARRIERS (§ 38*)—INTERSTATE COMMERCE—RATES—REBATES—APPLICABLE RATES—KNOWLEDGE—PRESUMPTION.

Where an interstate railroad company wrongfully applied transit rates to certain shipments of lumber, which were only entitled to higher local rates, the shipper's agents would be presumed to have knowledge as to which rates were applicable, which knowledge would be imputed to the shipper.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CARRIERS (§ 38*)—INTERSTATE COMMERCE—RATES—REBATES.

Where a shipper of lumber knowingly accepted a settlement on the basis of a transit rate, when the shipments were only entitled to local rates, it was no defense to a prosecution for rebating that the railroad company did not keep its rate sheet posted in two public and conspicuous places in its depot, as required by the Interstate Commerce Law.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

7. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING—INDICTMENT—VARIANCE.

In an indictment for accepting a rebate from an interstate carrier by the application of transit rates to certain local shipments of lumber to the transit point, and a reshipment thereof to other points, the fact that one of the cars was sold to the Illinois Central Railroad Company, shipped from the transit point to Chicago, and from there by the purchasing company to New Orleans, and that the latter company absorbed the charges between Chicago and New Orleans over its own line, did not constitute a fatal variance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

The Nichols & Cox Lumber Company was convicted of accepting and receiving a rebate on an interstate shipment of lumber, and brings error. Affirmed.

P. H. Travis, of Grand Rapids, Mich. (Ganson Taggart and Charles McPherson, both of Grand Rapids, Mich., of counsel), for plaintiff in error.

F. C. Wetmore, of Grand Rapids, Mich., and E. J. Bowman, of Greenville, Mich., for the United States.

Before WARRINGTON, KNAPPEN and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The defendant below was indicted and convicted upon three counts, in each of which it was alleged that the defendant did "knowingly and willfully solicit, accept, and receive," from the Grand Rapids & Indiana Railway Company, "a rebate," in a sum stated "in respect to the transportation" of property in interstate commerce, "whereby such property was transported * * * at a rate and charge less" by the sum so stated "than the rate * * * named in the schedules and tariffs * * * published and filed and posted" by the certain common carriers named in the indictment. The three counts describe three car loads of lumber shipped from Grand Rapids to destinations, as follows: The first count, a car load of hard wood flooring to New Orleans; the second, a car load of dressed lumber to Binghamton, N. Y.; and the third, a car load of rough lumber to Milwaukee. These shipments are the same as those described in counts 6, 7, and 8 of the indictment against the Grand Rapids & Indiana Railway Company, involved in the decision this day rendered in No. 2393 (212 Fed. 577); and, since the shipper is forbidden knowingly to "solicit,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

accept, or receive," just as the carrier is to "offer, grant, or give" rebates, and such acts are alike declared to be misdemeanors and punishable with the same penalties, the questions decided in the railroad case are determinative of this case, except as otherwise stated herein.

[1] 1. It is claimed that the provisions of the statute upon which the indictment and prosecution were based "have been repealed as a necessary result of the subsequent legislation on the same subject." Counsel's argument comes to be an assertion of conflict between section 10 of the original act to regulate commerce, as amended June 18, 1910 (36 Stat. L. 549, 550), and section 1 of the Elkins Act, as amended by the Hepburn Act of June 29, 1906 (34 Stat. L. 587, 588). The theory is that this conflict is such as to work an implied repeal; but the settled rule that repeals by implication are not favored is admitted. The principle sought to be applied is that the later act embraces the whole subject, and so supplants the earlier act. This does not, however, avoid the rule concerning repeals by implication; for, as Mr. Justice Harlan said in Frost v. Wenie, 157 U. S. 46, 58, 15 Sup. Ct. 532, 537 (39 L. Ed. 614):

"Where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court—no purpose to repeal being clearly expressed or indicated—is, if possible, to give effect to both."

[2] Comparison of the two sections in dispute shows that they are aimed at different evils, and that they define and denounce the acts constituting such evils as separate and distinct offenses. Broadly speaking, these evils and the consequent offenses are described and known as "rebating" and "false billing"; the former usually succeeding and the latter preceding payments of freight charges. It is true that the results sought to be attained by the perpetrators of such offenses are the same, in the sense that they operate to reduce the established rates; it results that the language found in each of the enactments is in some respects necessarily similar to that of the other; and yet the dominant features of each act point to a distinction that cannot be misunderstood. In the earlier act, for example, it is made unlawful "to offer, grant or give, or to solicit, accept or receive a rebate;" while in the later act "false billing, false classification, false weighing or false report of weight" are denounced against the carrier, and "false billing, false classification, false weighing, false representation of the contents of the package or the substance of the property, false report of weight, false statement" against the shipper.[1] This is enough, we think, at once to differentiate the two enactments and reconcile the legislative objects of preserving both, as also of providing a different penalty for the violation of each. Hence, unless we

---

[1] Further illustration of this distinction may be found in another provision of section 10, above mentioned, which prohibits the shipper from obtaining or attempting to obtain "by false statement or representation as to cost, value, nature, or extent of injury, or by the use of any false bill, bill of lading, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to be false, fictitious, or fraudulent, or to contain any false, fictitious or fraudulent statement or entry * * * any allowance, refund, or payment for damage or otherwise," whereby transportation is secured at less than the regular rates.

are mistaken in our interpretation of the main purposes of these two acts, there can be no escape from the decision in Frost v. Wenie, supra.

[**3**] 2. It is not conceded here, as it was in the railroad case, that there was no transit privilege of the railway company which could be rightfully applied to the three inbound shipments that were made the basis of the transit rates accorded to the three (outbound) shipments described in the present indictment. In the course of the charge, when defining a "transit or stop-off privilege," the court said:

"As applied to shipments of lumber the privilege consists in the right to stop a car in transit for certain purposes, for the purpose of dressing, manufacturing, sorting, storing, reconsigning, partly unloading, or to complete loading, and the reforwarding under a through rate from point of origin to destination; in other words, the tariffs then in force entitled a shipper of lumber to stop a car at Grand Rapids for the purpose of dressing, or sorting, or partially unloading, or manufacturing, and then reshipping or reconsigning that, or some other lumber, or the product of that lumber.

"It appears from the evidence in this case and is undisputed that under the transit tariff then in force, neither of the inbound shipments of lumber was entitled to a transit privilege nor a stop-off charge."

Error is specially assigned to this latter paragraph. After describing the three inbound shipments that were used with the three outbound shipments for the purpose of applying the transit rates, the court ruled (and exception thereto was taken though error is not assigned):

"So that as a matter of law none of the inbound shipments specified in the proofs in this case could constitute or did constitute the basis of a transit privilege, and the defendant had no right to claim a transit privilege, upon any of those shipments."

Now, if we assume that the assignment reaches all these portions of the charge, it is unavailing. In the first place, under the transit privilege given by the railway tariff—in part quoted in the margin [2]—

[2] "Lumber and articles taking lumber rates * * * in car loads which originate on G. R. & I. Ry. or on foreign lines named below, may be stopped to dress, work, sort, reconsign, partly unload or to complete loading at stations on Grand Rapids & Indiana Ry. on basis of through rate point of origin to final destination in effect at date of shipment via routes provided in tariffs lawfully on file with Interstate Commerce and State Commissions at a charge of $3.00 per car in addition to tariff rates, except as provided in item No. 10, settlement to be made with agent at stop-off station. The stop-off charge is to be applied on the car or cars received at the stop-off station. * * *

"When from other foreign lines, the through rates from points of origin to final destinations will apply, provided all lines over which the shipments travel join in the rates. * * *

"On shipments originating on the Grand Rapids & Indiana Railway, the rate to stop-off station will be the difference between the through rate from point of origin to final destination and the rate from stop-off station. * * *

"On shipments originating on foreign line, the rate to junction station, where received on Grand Rapids & Indiana Railway, will be such lines' proportion of the through rate to final destination. * * *

"To receive the benefit of through rates point of origin to final destination, shipments must be re-consigned within one year from date of bill of lading at point of origin. * * *

"The lading forward must be of the same kind as the original lading, i. e., soft lumber inbound and outbound, hard wood lumber inbound and outbound,

a through movement is contemplated, with suspension at the transit point for one or more specified purposes, and later a reconsignment to destination. In the next place, considering all the tariff provisions pointed out, we may, in deference to counsel's argument, assume, though the facts do not call upon us to decide, and we do not decide, either that an inbound shipment of lumber may be stopped at the transit point and piled (say in defendant's yard) and then replaced by and the movement continued with other similar lumber, or that the inbound movement may, through reconsignment alone, be continued with the same lumber; but it will be noticed that upon this theory at least constructive relation and identity between such piled and substituted lumber, and actual relation in the other instance, may be shown to exist between the inbound and outbound shipments. Still, upon this view, or even on the most liberal theory of interpreting the transit tariff, the lumber involved in the instant case was not entitled to a transit rate. The facts concerning the three inbound shipments are not in dispute. The lumber comprised in two of them was sold and consumed in Grand Rapids, and that contained in the remaining inbound shipment was reconsigned at the transit point and sent to Holland, Mich.

It is too clear for argument that the objects of these inbound shipments, including that of the reconsigned shipment, had been fully accomplished; the objects, as well as the shipments, were beyond recall within the most generous view that can be taken of the transit tariff—they were dead. It is therefore impossible in such circumstances to show the existence of any sort of relations between such inbound lumber and that of the outbound shipments; and this is what the present case comes to. However, complaint is made that defendant was not permitted to show that at the time it presented the inbound freight bills, which it had paid on these dead shipments, it had other inbound bills that might rightfully have been used as a basis

shingles inbound and outbound, etc., mixed car loads of the above commodities, will be permitted, but no substitution that will in any way impair the integrity of the through rate.

"The station at which the stop takes place must be on the direct line of G. R. & I. Ry., in direction shipment is moving between points of origin and final destinations. * * *

"Shipments may be reconsigned under the above conditions without stop-off charge provided there has been no change in lading and car is not delayed more than 24 hours and no extra switching service has been performed at station where reconsignment takes place. If delayed beyond 24 hours $3.00 stop-off will be charged for each car.

"Billing Instructions. Agent making card and regular waybills for original load will insert under proper heading name of station at which car should be stopped and for what purpose, name of party who is to handle shipment, and will stamp at top margin of card and regular waybills in two conspicuous places 'stop-off car.' Regular waybill must be mailed to the stop-off station.

"Shipments will be billed to the stop-off station at the weights and rates provided for herein. The charge made for stopping cars should be inserted on regular waybills in 'advance' column specifying what it is for and notation must also be made in bills of lading. * * *

"All shipments will be rebilled from the stop-off station at remainder of through rate after deducting the rates which are applied from point of origin to the stop-off station."

for the transit rates in dispute. Further, it is, in substance, urged that the outbound lumber was transit stock, and entitled to the benefit of transit rates; the idea being that the lumber was not produced at Grand Rapids, but at points beyond from which it might have been moved on through rates. And so it is at last insisted that the most the defendant did was to obtain proper rates in an improper manner. Surely this argument, however plausible, cannot be sound. It fails to consider that a transit tariff is, as pointed out in the railroad case, a special privilege which is available only on the performance of a condition precedent. As applied to counsel's argument, defendant was not entitled to a through rate except on the surrender of a legally applicable inbound bill—a live bill, not a dead one. Nor is it important that the outbound lumber might in seasonable time have been given the transit privileges and rates between the points of origin and the ultimate destinations. This was no more the performance of the requisite condition precedent than was the presentation of dead bills. In short, upon any theory of the transit tariff, defendant's acts and omissions precluded it from so procuring the through rates, and since its methods were improper, the rates it obtained were themselves improper; both were in plain conflict with the act of Congress, which forbids soliciting rebates.

[4, 5] 3. It is strenuously urged that the defendant could not rightfully be convicted because: (a) its agents, who in effect solicited the unlawful rates, were ignorant of the disposition that had been made of the inbound lumber; and (b) they acted "under a good-faith misapprehension as to the interpretation to be given to the tariffs." It is enough to say of the first of these reasons that the evidence in the instant case was sufficient to warrant the jury in finding that some of defendant's agents really knew what had been done with the inbound lumber; and we see no way rationally to distinguish this feature of the case from the corresponding portion of the decision in the railroad case. As to the second reason, the only question involved concerned a choice between the local and the transit rates, and, aside from their obvious knowledge that the latter was the lower rate, the agents, and consequently the defendant, must be presumed to have known which was applicable. Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 165, 166, 32 Sup. Ct. 648, 56 L. Ed. 1033; Armour Packing Co. v. United States, 209 U. S. 56, 86, 28 Sup. Ct. 428, 52 L. Ed. 681; Rosen v. United States, 161 U. S. 291, 16 Sup. Ct. 434, 40 L. Ed. 606; Standard Oil Co. of N. Y. v. United States, 179 Fed. 614, 627, 103 C. C. A. 172 (C. C. A. 2d Cir.); Reynolds v. United States, 98 U. S. 145, 167, 25 L. Ed. 244. And here we may dispose of a somewhat kindred assignment of error respecting the court's charge that:

"It appears by the evidence in the case, and it is undisputed, I think, that the railway tariffs and schedules of rates were properly filed and posted and published," etc.

[6] Apart from the evidence tending to show that the railroad rate sheet was accessible to defendant's agents, it is sufficient to say that, even if printed copies were not "kept posted in two public and conspicuous places in every depot" etc., such failure would not excuse

212 F.—38

defendant. United States v. Miller, 223 U. S. 599, 604, 32 Sup. Ct. 323, 56 L. E'd. 568.

[7] 4. It is insisted that there is a fatal variance between the allegations of count 1 and the evidence adduced in its support. The difficulty arises from the facts that among the connecting lines alleged in the indictment to have transported the lumber from Grand Rapids to New Orleans was that of the Illinois Central between Chicago and New Orleans, and that the Illinois Central, having purchased the lumber from defendant, transported it over its line without charge. It is alleged in the indictment that the "lawful charges" for transporting the lumber were collected at destination. It is not disputed that the allegations of the indictment in all other respects were proved. The proofs in this case show a scheme like that passed upon in the case against the Grand Rapids & Indiana Railway Company, before cited, and it is not necessary to repeat the facts in that behalf here. The circumstance that the Illinois Central absorbed the charges over its own line did not mislead the defendant, or in any wise prejudice its defense. 1 U. S. Comp. Stat. § 1025, p. 720. With this explanation, what was said in the railroad case upon the subject of variance must be regarded as concluding the present question.

Our consideration of the record satisfies us that upon the issues made at the trial the evidence was sufficient to warrant the verdict, and that no reversible error occurred in the rulings or charge of the trial court.

The judgment below is accordingly affirmed.