LEWIS, LEONHARDT & CO. v. SOUTHERN RY. CO.

(Circuit Court of Appeals, Sixth Circuit.   October 16, 1914.)

No. 2466.

1. CARRIERS (§ 32*) — MILLING IN TRANSIT — THROUGH RATES — DISCRIMINA-
TION—REBATES.

Complainant at Knoxville manufactured a saccharine feed consisting
of 50 per cent. oats and corn, 26 per cent. molasses, 10 per cent. cotton
seed meal, 10 per cent. corn shive, and 4 per cent. salt.   The corn and
oats were shipped from points north of the Ohio river through Cincin-
nati and Louisville, and the other ingredients, except the salt, from points
in the South.   The feed was shipped from Knoxville to points east and
south, and by an agreement with defendant complainant was allowed a
milling in transit privilege, by which the feed was shipped out on the
through rates applying to the corn and oats.   Since these grains com-
posed only half of the feed, complainant at first was compelled to sell
locally one-half of the corn and oats shipped in, but, this being incon-
venient, it was later arranged that complainant should be permitted to
ship out double the quantity of feed as compared with the corn and oats
shipped in.   Complainant paid the inbound local rates on the articles en-
tering into the product and the outbound proportional rates on the feed
and, under arbitrary calculations, was afterwards reimbursed in the form
of refunds on the hypothesis that the ingredients were all transit arti-
cles like the corn and oats, and so entitled, when milled, to the transit
rate.   Held, that such agreement violated Interstate Commerce Act (Act
Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1913, § 8564]) § 2, pro-
hibiting rebates, sections 6, 10, as amended by Act March 12, 1889, c.
382, §§ 1, 2, 25 Stat. 855, 856 (sections 8569, 8574), forbidding the col-
lection or receipt of less compensation for transportation of property
than is specified in published schedules of rates, and Elkins Act Feb. 19,
1903, c. 708, 32 Stat. 847 (sections 8597-8599), prohibiting concessions,
rebates, etc.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83-85;   Dec.
Dig. § 32.*]

2. CARRIERS (§ 35*)—INTERSTATE COMMERCE—ILLEGALITY OF CONTRACT—AC-
TION FOR DAMAGES.

Where a contract between a shipper and a carrier for a milling in
transit privilege was in material part violative of the Interstate Com-
merce Act, such illegal portion was alone sufficient to vitiate the whole
contract, and prevent recovery of damages for its breach.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94;   Dec. Dig
§ 35.*]

In Error to the District Court of the United States for the Eastern
District of Tennessee; Edward T. Sanford, Judge.

Action by Lewis, Leonhardt & Co. against the Southern Railway
Company.   Judgment for defendant, and plaintiff brings error.   Af-
firmed.

G. W. Pickle, of Knoxville, Tenn., for plaintiffs in error.

Leon Jourolmon, of Knoxville, Tenn., and C. B. Northrop, of Wash-
ington, D. C., for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and
TUTTLE, District Judge.

WARRINGTON, Circuit Judge.   This was an action to recover
damages ($100,000) for breach of a contract, set out in the first and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
217 F.—21

third counts of the declaration. The contract in each of the forms alleged concerned a milling in transit arrangement, entered into by the parties in 1901, and in one form or another observed until 1907, when the ultimate breach complained of occurred. At the close of plaintiff's evidence a motion to direct a verdict in favor of defendant was allowed, and plaintiffs bring error.

[1] Prior to and in 1901 the plaintiffs were engaged in the business of selling hay, grain, and feed, at Knoxville, and in December of that year they added to their business the manufacture and sale of dairy feed, called "Saccharine Feed." The contract is alleged to have been made through letters, schedules, and documents appearing in the record, and in substance to have been this: That plaintiffs should establish a manufacturing plant at Knoxville, and pay upon the raw material shipped to and manufactured at the plant and upon the feed shipped out no greater rate than the established through rate on the product from the point of original shipment of raw material to the point of sale and delivery of the feed; that for every 50 pounds of oats and corn, or corn products, shipped to Knoxville and there milled as part of the feed, the plaintiffs should have the right to ship over defendant's lines to ultimate destinations 100 pounds of the product, or in like ratio or proportion; and that defendant for a short season complied with the contract, and issued and published its tariff and rate sheets accordingly. The provision stating the relation in quantities between raw material shipped in and finished product shipped out, is called in the evidence a "two for one" arrangement; this provision appears in the first count, but not in the third, and constitutes the main difference between the counts; and, while it is said to have originated with the railroad and to have been forced on plaintiffs, it was acquiesced in too long by all parties to escape the effect of the rule touching the practical construction of contracts. It was further alleged that the arrangement was to be continued so long as the privilege of milling in transit was granted to other persons at Knoxville. The saccharine feed, according to schedules filed by defendant, consisted of ingredients and in proportions: corn 35 per cent., oats 15 per cent., molasses 26 per cent., cotton seed meal 10 per cent., corn shive 10 per cent., salt 4 per cent. An article known as marsden feed, which is described as "composed of the entire stalk of corn, blade and shuck" except the pith of the stalk, was for a time used in the mixture in question, but was changed in name to that of "corn shive" at the instance of the railroad; and later rice chaff was used in place of corn shive.

It will be observed that oats and corn constituted 50 per cent., and that the remaining articles made up the other 50 per cent. of the ingredients entering into the feed. The oats and corn so used at Knoxville, were shipped from points north of the Ohio river through Cincinnati and Louisville. The other ingredients were shipped into Knoxville generally from the following places: Molasses and rice chaff from New Orleans, cotton seed meal from Memphis, and salt from Cincinnati. While the feed was shipped from Knoxville to many points east and south of that city, it was stipulated by the parties that what was true in respect of such shipments from Knoxville out is suffi-

ciently illustrated by the facts in relation to shipments from Knox-ville to Norfolk and Richmond. Thus Knoxville was the transit point within the territory indicated by the points of origin of the articles used in the milling process and the destinations of the product into which they were converted.

The local rates into Knoxville and out and the through rates upon the articles entering into the composition, as also the through rate applied to the product, and the use and application made of some of these rates, during the period in question, will serve to explain the operation and effect and the true intent of the contract in dispute. For present purposes it is enough to refer to the rates mentioned in the margin.[1] There are two methods of practical performance of the contract shown in the record. For a time prior to the "two for one" arrangement the plaintiffs shipped into Knoxville double the quantity of oats and corn used in any given quantity of feed shipped out. Of the oats and corn so shipped in, one half was sold locally and the other half, with an equal quantity of the other articles, was used in making the feed. When the product was shipped out, it was treated as equal to the total quantity of oats and corn shipped in, and so entitled to the through rate that would have been chargeable upon the product if it had moved from Cincinnati or Louisville to Norfolk or Richmond. This plan was apparently adopted as a basis for shipping out feed equal in quantity to that of the oats and corn shipped in. The plaintiffs complained of the plan because it imposed upon them the trouble of selling one-half the oats and corn locally, and unnecessarily complicated the accounts of both parties, as also the settlements of freight charges. The plan was abandoned and the two for one arrangement substituted as an "equivalent." The latter arrangement did not require shipping in more oats and corn than were needed in making the feed; thereafter, if not before, the molasses, rice chaff, cotton seed meal, and salt were in effect, though not in name, given the benefits of the privilege of milling in transit regardless of the differences in points of origin between these articles themselves and between such

---

[1] The local rate (per 100 lbs.) on oats or corn in car loads from either Cincinnati or Louisville to Knoxville was 19 cents, the through rate on corn or oats, as also on feed, from either of the first two cities named to Norfolk or Richmond in car loads was 12 cents per 100 pounds, and the local proportional rates allowed plaintiffs on their feed from Knoxville out, were 8 cents to Norfolk and 6.9 cents to Richmond (and these rates appear in the testimony of plaintiffs' principal witness and were used in the freight settlements, though they are not shown to have been set out in any published tariff), while the published tariff rate between the same cities on feed in either car loads, or less than car loads, was 27 cents. The local rates per 100 pounds in car loads into Knoxville on the other articles entering into the feed were: Molasses and rice chaff from New Orleans 25 cents and 20 cents, respectively; cotton seed meal from Memphis 13 cents; salt from Cincinnati 13 cents; and the through rates on these last-named articles from their several initial points to Norfolk or Richmond were, in the order just mentioned, 26 cents, 26 cents, 25 cents, and 18.5 cents. The through rates on feed (in 1901 to 1904) from Memphis to Norfolk or Richmond were 35 cents and 59 cents, and thereafter 29 cents and 41½ cents, respectively, in car loads and less than car loads; and the rates on saccharine dairy feed from New Orleans to Norfolk and Richmond were (in 1901 to 1905) 37 cents and (after March, 1905) 26 cents, respectively, in either car loads or less than car loads.

points (except as to the salt) and those of the oats and corn; and after the ingredients including oats and corn, were assembled and milled at Knoxville, the product was still treated as entitled to the through rate the same as it had been under the first plan.

It cannot escape notice that under the applicable rate classification none of the articles comprised in plaintiffs' saccharine feed was "feed" when shipped into Knoxville; and that the through rate on feed between Cincinnati or Louisville and Norfolk or Richmond was lower than the through rate on any of the ingredients entering into plaintiff's mixture except oats and corn. True, there was a through rate alike on feed from Memphis and saccharine dairy feed from New Orleans, both to Norfolk and Richmond; but no milling in transit privilege concerning feeds or their ingredients originating at such points was shown, and, in short, they were not made transit articles at all. Hence, as regards the milling in transit privilege in question, we may safely eliminate feed originating at Memphis or saccharine dairy feed at New Orleans and, as respects transit articles, confine our attention to feed and oats or corn originating at Cincinnati or Louisville. It will be recalled that the through rate on feed from Cincinnati or Louisville to Norfolk or Richmond was 12 cents; and the plaintiff, Lewis, testified, in respect of plaintiffs' milling in transit privilege and of this rate, that "all in excess of 12 cents is the shipper's money when the transaction is completed."

The controlling question thus arises whether the contract relied on could be lawfully made. The insistence for plaintiffs in substance is: The contract related only to the milling in transit privilege and not to rates; it was entered into before the enactment of the Hepburn law, was not until the passage of that act within the jurisdiction of the Interstate Commerce Commission, and so the parties were at liberty to make such nonexclusive arrangement as they saw fit; and since the privilege was similar to other milling privileges given by defendant in Knoxville, the only course open to the railroad was either to withdraw all such privileges, including plaintiffs', or simply to introduce new rates. It is enough to say of "similar privileges" at Knoxville that no other privilege like the one now in issue was shown. The argument that this contract had no relation to rates cannot be sustained. The essential object of the usual milling in transit privilege is to enable shippers to employ a method of transit which, but for the privilege, would subject the material to local rates instead of entitling it to an ultimate through rate. The through rate is applied later upon the theory and the condition that stoppage at the transit point was for some legitimate treatment of the material, and that the continuation of the transit desired is of the same material, its product or equivalent, to a through rate destination. See In re Substitution of Tonnage at Transit Points, 18 Interst. Com. Com'n R. 280, 284. Thus the object at last is to escape local rates and secure a through rate; indeed, apart from this object a milling in transit privilege would have no reason to exist. The privilege of course enters into the cost of transportation, and so in effect is part of the contract for through shipment; this is ordinarily covered by the rate; and such is the theory upon which the privilege is required to be specified in the pub-

lished tariff.    Unlawful Rates on Trans. Cotton by K. C. M. & B.
R. R., 8 Interst. Com. Com'n R. 121, 135, opinion by Commissioner
Prouty in 1899; and see Shiel & Co. v. Ill. Cent. R. R. Co., 12 Interst.
Com. Com'n R. 210, 215, decided in 1907.    True, the privilege may
involve more service and expense (such as excessive switching and
detention of cars and the like at the transit point) than the carrier can
afford to undertake for the rate; in that event an additional reason-
able charge may be imposed (Southern Ry. Co. v. St. Louis Hay Co.,
214 U. S. 297, 301, 29 Sup. Ct. 678, 53 L. Ed. 1004), but this does
not change the real nature and effect of the privilege.    The integrity
alike of the local rates and the through rate is manifestly dependent
upon the nature of the privilege, as well as its observance.    And if the
privilege now in issue, either in terms or as it was practically under-
stood and interpreted by the parties, failed to protect these rates, it
was, as we shall see, quite as certainly violative of the law before the
passage of the Hepburn Act as it was after; but it is to be observed
that the right in Congress (and its right is conceded) to empower the
Interstate Commerce Commission to regulate such privileges, logically
leads to the conclusion that the power of the railroad in respect of the
privileges is in its nature a continuing power and similar in character to
the rate-making power.    The free and proper exercise of such power
cannot be fettered by contract.    Armour Packing Co. v. United States,
209 U. S. 66, 82, 28 Sup. Ct. 428, 52 L. Ed. 681; Louisville & Nash-
ville R. R. v. Mottley, 219 U. S. 468, 482, 31 Sup. Ct. 265, 55 L. Ed.
297, 34 L. R. A. (N. S) 671.    There can be no difference at bottom
between the right directly to change or withdraw a rate and the right
indirectly to do the same thing through alteration or withdrawal of a
milling in transit privilege.

Furthermore, plaintiffs' argument fails to give due weight to the
effect upon the rates, which resulted from shipping the ingredients
of the feed from the different sources stated into the transit point
and then shipping the feed out under a through rate which was not
in terms applicable to substantial portions of the feed; in other words,
the through rate on "feed" was evidently made in contemplation of
the movement of materials shipped into the transit point from sources
corresponding with those indicated by the rate itself.    See opinion of
Commissioner Clements in Shiel & Co. v. Ill. Cent. R. R. Co., supra,
12 Interst. Com. Com'n R., at page 215.    This effect of the contract
upon the rates became apparent the moment it was shown that the
molasses, rice chaff and cotton seed meal were shipped to Knoxville
from New Orleans and Memphis instead of Cincinnati or Louisville.
We have seen that under the first method resorted to in performance
of the contract the basis for each shipment of finished product out was
the shipment in of a quantity of oats and corn equal to the total quan-
tity of product shipped out, and that one-half the oats and corn was
sold locally and the ingredients other than oats and corn entering into
the product were substituted.    This method treated the oats and corn
disposed of locally the same as if they had been used in making the
outgoing product, and the application of a through rate upon that
theory was clearly opposed to the ruling of this court in Grand Rapids

& I. Ry. Co. v. United States, 212 Fed. 577, 585, 129 C. C. A. 113, and in Nichols & Cox Lumber Co. v. United States, 212 Fed. 588, 591, 592, 129 C. C. A. 124. That method was abandoned in July, 1904, and the "two for one" plan substituted as stated. This did not relieve the situation; the effect remained practically the same as before. The vice of the privilege was that the local rates and the through rate were not, and, consistently with the contract, could not be protected. The Interstate Commerce Commission dealt with the subject to some extent in Re Substitution of Tonnage at Transit Points, supra, 18 Interst. Com. Com'n R., at pages 284, 292. On the latter page it is said:

"The maker of mixed feed mills together a number of grains and sometimes cotton seed meal and molasses, producing what is practically a new commodity from various substances, some received upon transit rates and others secured either locally or upon nontransit rates. The present practice at many points is to forward cars of the mixture thus produced upon the transit of solid cars of grain. What has been said above regarding the blending of wheat by millers, and regarding the forwarding of mixed cars, and also regarding the substitution of the local supply for transit tonnage consumed locally, fully indicates the position of the Commission regarding this question of mixed feed. We are convinced that great abuses exist in shipments of this character, but they do not seem to be other than a combination of the abuses separately discussed above. Regarding this matter of the forwarding of mixed feed, it is proper to suggest that there must be a limit to the application of the transit practice, and this limit must be reached when there is such a process of manufacture and such a loss of identity of the inbound commodity that the shipment forwarded may be said to be a new creation. Some of the mixed feeds brought to our attention appear to be beyond the fair limits of a transit practice."

We are disposed to believe that the contract and its practical execution in the instant case contravened the acts of Congress concerning rebates, drawbacks, or other devices, as declared by section 2 of the act to regulate commerce (24 Stat. L. 379), forbidding the collection or receipt of less compensation for transportation of property than is specified in published schedules of rates, as prescribed by sections 6 and 10 of the act as amended March 12, 1889 (25 Stat. L. 855, 856), and also prohibiting rebates, concessions, or discrimination in respect of the transportation of property "whereby any * * * property shall by any device whatever be transported at a less rate than that named in the tariff published and filed by such carrier," as provided in the Elkins Act of February 19, 1903 (32 Stat. L., pt. 1, p. 847).

We shall gain a clearer view of the effect of this statutory policy upon the contract if in the light of the facts already pointed out we consider the methods of settlement, including the system of refunds, adopted, when applying the transit rate (i. e., the 12 cent through rate) to the feed. The plaintiffs paid the inbound local rates on the articles entering into the product and the outbound proportional rates on the product itself, and under purely arbitrary calculations were afterwards reimbursed, in the form of refunds, upon the hypothesis that the ingredients were all transit articles, like the oats and corn, and so entitled, when milled, to the transit rate. Judge Sanford found that the settlements were made by—

"calculating the milling in transit refund on one-half of the ingredients from their points of origin and then doubling the amount of this refund on the

theory that it represents approximately the milling in transit refund on the other one-half of the ingredients from their points of origin."

We understand this to mean, and the practical construction of the contract to have been, that such calculations were made with respect to the local rates on inbound shipments of oats and corn and the proportional rates on outbound shipments of product. This would seem to have been also in accord with the practical construction placed by the parties on the schedules (or circulars, as they are called in the record), which were filed with the Interstate Commerce Commission. It must be said that these circulars are ambiguous and difficult to understand, which augments the binding force of the interpretation placed on them by the parties in their performance of the contract. The substance and effect of the circulars are, we think, sufficiently shown in the margin.[2]

Under the method of settlement before mentioned the oats and corn were alone treated as transit articles and as constituting the entire product; but obviously this ignored the fact that 46 per cent. of the product (excluding the 4 per cent. of salt derived from Cincinnati) was composed of articles that were not shipped in from initial points corresponding with those of the oats and corn, and so were not open to treatment either as transit articles or as entitled to the transit rate. We say this notwithstanding the fact that the constituent elements of the feed are given in the circulars; for, as before shown, these ingredients (except corn and oats) were not made transit articles by any transit privilege, and we need not say again they were never in terms so regarded by the parties themselves. When we consider then the volume of plaintiffs' business, as indicated by the evidence, and the excess of the inbound local rates on molasses and rice chaff over the inbound local rate on oats and corn, it is manifest that the method inured to the substantial advantage of the plaintiffs; and it is equally plain that plaintiffs received in every settlement, under the guise of

2 We find eight of these circulars in the record. All of them permit "oats and corn" to be shipped "from or through Louisville * * * or Cincinnati * * * to Knoxville * * * milled into dairy or saccharine feed and reshipped" to points named.

Paragraph 3: "For every 35 pounds of corn and 15 pounds of oats received at mill, 100 pounds of dairy or saccharine feed may be shipped out."

Paragraph 5: "Shipments of corn and oats to be milled in transit shall be billed at full tariff rate from point of origin to milling point."

After stating the percentages of the several ingredients entering into the feed, as set out in the opinion, it is provided that "expense bills for corn and oats only will be honored in milling in transit arrangement to the extent shown in paragraph 3."

After providing time limits as to expense bills, paragraph 9 of one of the circulars (relied on in plaintiffs' brief) is as follows: "When the conditions of the rails of this circular have been fully complied with. there will be due the miller at Knoxville, Tenn., refunds as follows: The excess over the sum of the rates paid on the corn and oats from point of origin into the mill and the dairy or saccharine feed out of the mill. And the rate (class D) on the dairy or saccharine feed reshipped from point of origin of the corn or oats to ultimate destination of the milled product as published in Southern Railway Southeastern Tariffs, or as amended by supplements or subsequent issues."

(We take it that the portion of this ninth paragraph, which succeeds the words "refunds as follows," was meant to be a single sentence.)

milling in transit refunds, distinct portions of the inbound local rates which they had previously paid on at least 46 per cent. of the non-transit tonnage of their output, and so obtained rates thereon less than the applicable published tariffs; and the statutes are too plain and the decisions too numerous and clear to justify elaboration in showing that every such refund was in material part a rebate. Armour Packing Co. v. United States, 209 U. S. 56, 71, 80, 81, 28 Sup. Ct. 428, 52 L. Ed. 681; N. Y., N. H. & Hartford R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 391, 392, 26 Sup. Ct. 272, 50 L. Ed. 515; United States v. Union Stockyard, 226 U. S. 286, 308, 33 Sup. Ct. 83, 57 L. Ed. 226; Kansas City So. Ry. v. Albers' Comm. Co., 223 U. S. 573, 596, 32 Sup. Ct. 316, 56 L. Ed. 556; Chicago & A. Ry. Co. v. United States, 156 Fed. 558, 562, 84 C. C. A. 324, 26 L. R. A. (N. S.) 551 (C. C. A., Seventh Circuit); Cleveland, C., C. & St. L. Ry. Co. v. Hirsch, 204 Fed. 849, 852, 853, 123 C. C. A. 145, and citations (C. C. A., Sixth Circuit). It follows that filing the circulars with the Interstate Commerce Commission respecting such a milling in transit privilege was futile. The railroad company had no power to grant and the plaintiffs no right to receive such a privilege.

[2] Plaintiffs are now seeking recognition and enforcement of the contract through recovery of damages for its alleged breach. The illegal portion pointed out was alone sufficient to vitiate the whole contract and prevent its enforcement. Cleveland, C., C. & St. L. Ry. v. Hirsch, supra, 204 Fed. at pages 853, 854, 123 C. C. A. 145, and citations. We need not pass upon the other questions presented, although we have fully considered them.

The judgment must be affirmed with costs.