GRAND RAPIDS & I. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.    April 7, 1914.)

No. 2393.

1. CARRIERS (§ 38*) — INTERSTATE COMMERCE — REBATING — INDICTMENT — VARIANCE.

Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, 34 Stat. 584, 587 (U. S. Comp. St. Supp. p. 1309), forbids a carrier in interstate commerce to employ any rebate, concession, or discrimination or any device whatever respecting the transportation of property at a less rate than that named in the tariffs published and filed by the carrier. *Held*, that where an indictment charged rebating in the application of an existing transit tariff to local shipments, in that defendant collected of the shippers enough to pay the transit rates and charges on both inbound and outbound shipments and then paid the shippers sums equal to the local tariffs previously received from them on the inbound shipments, which method operated in every instance, in form, to convert strictly local shipments and rates, both inbound and outbound, into transit shipments and rates, the fact that the offense charged was the giving of a rebate on the outbound shipment, while the proof showed that it was given, if at all, on the inbound shipment, and that the indictment averred violations of the local tariffs, while the proof showed violations of the transit tariffs, did not constitute a fatal variance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

2. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING—INDICTMENT—DEVICE.

In a prosecution of an interstate carrier for rebating, it is not necessary that the indictment should set out the method or device resorted to to avoid the law, the device constituting no part of the offense denounced by Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, 34 Stat. 584, 587 (U. S. Comp. St. Supp. 1911, p. 1309).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

3. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REGULATION—REBATING—EVIDENCE.

Where an indictment charged an interstate carrier with rebating in applying lower transit rates to strictly local shipments and alleged the applying of such transit rates to certain so-called outbound transactions, evidence of the carrier's acts concerning inbound shipments, tending to disclose a scheme calculated to conceal and carry out the offense charged in the indictment and to show the means used to accomplish the end, was admissible.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

4. CARRIERS (§ 38*)—INTERSTATE COMMERCE—OFFENSES—REBATING.

The precise sums alleged to have been repaid by an interstate carrier not being of the essence of the offense of rebating in violation of Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, 34 Stat 587 (U. S. Comp St. Supp. 1911, p. 1309) failure to prove the amounts pleaded in the various counts of the indictment as having been repaid as rebates was not material.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

5. CARRIERS (§ 38*)—INTERSTATE COMMERCE—OFFENSES—REBATING—KNOWLEDGE.

Where, in a prosecution of an interstate carrier for rebating, papers and records giving complete information concerning the shipment were on file

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
212 F.—37

in the carrier's freight offices and accessible to the employés who conducted the so-called outbound transactions to which an improper transit rate was applied, the fact that the particular agents who executed such outbound transactions did not know that the lumber shipped and contained in the outbound cars had been used locally or reconsigned at the transit point so as not to be entitled to the lower transit rate was insufficient to show that the rebates were not knowingly made.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

6. CARRIERS (§ 32*)—INTERSTATE COMMERCE—TRANSIT RATES—APPLICATION.

Before a lower transit tariff can be applied by an interstate carrier to a shipment through a transit point, it must appear that there is some relation between the outbound and an inbound shipment; it being conceded that an inbound shipment consumed or reconsigned at the transit point cannot rightfully be made the basis of a transit shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

7. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING—DEFENSES—INSTRUCTIONS.

Where, in a prosecution of an interstate carrier for rebating in applying lower transit rates to certain local shipments, defendant claimed that as soon as the error was discovered it collected from all the shippers but one, who refused to pay, amounts sufficient to cover the full tariff rates, an instruction, that the offense should be regarded as consummated and beyond recall or not and the verdict rendered against or in favor of defendant according as the jury should conclude that defendant acted with or without knowledge of the facts, was as favorable to defendant as it was entitled to.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

8. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING—TRANSIT SHIPMENTS.

In a prosecution of an interstate carrier for rebating in applying lower transit rates to local shipment of 14 outbound cars of lumber during March, April, and May, 1911, the court did not err in excluding evidence concerning all other transit shipments made by the same shippers during the same months to show that the disputed shipments were allowed by the carrier without any intention of violating the law.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

9. CARRIERS (§ 38*)—INTERSTATE COMMERCE—OFFENSES—REBATING—SEPARATE OFFENSE.

Defendant interstate carrier was indicted for rebating in applying transit rates to 14 local shipments of lumber. The indictment contained a separate count for each shipment, and it appeared that each outbound car load was transported under a distinct shipping order which was accompanied by a receipted bill called "expense bill" for freight charges which had been previously paid by the shipper on an inbound shipment, which bill was made the basis of a transit shipment of the outbound car load. Each refund was paid by a draft in the month succeeding the shipment, except one which was paid the second succeeding month, and four of the payments each included two car loads. Each of the four shipments, however, were made to different consignees, except two which were made on different dates. Held, that the joinder of payments was a mere matter of convenience, intended to be appropriately divided and applied to the transactions to which they respectively belonged; and hence the court

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

properly held that there were 14 and not 10 separate offenses and assessed the punishment accordingly.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

The Grand Rapids & Indiana Railway Company was convicted of rebating, and it brings error. Affirmed.

J. H. Campbell, of Grand Rapids, Mich., for plaintiff in error.

F. C. Wetmore, of Grand Rapids, Mich., and E. J. Bowman, of Greenville, Mich., for the United States.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The railway company was convicted of having paid rebates in March, April, and May, 1911, upon certain shipments of lumber from Grand Rapids, Mich., to various destinations. Judgment was entered on the verdict and a fine imposed; the company prosecutes error. The proceeding was based on section 1 of the statute of Congress commonly known as the Elkins Act, approved February 19, 1903 (chapter 708, 32 Stat. 847), as amended June 29, 1906 (chapter 3591, 34 Stat. 584, 587 [U. S. Comp. St. Supp. 1911, p. 1309]).

The alleged rebates grew out of admitted abuses of transit privileges accorded to shippers of lumber. It was developed at the trial that 14 car loads of lumber had been shipped to and 14 car loads shipped from Grand Rapids, but without any transit relations that would entitle either the inbound shipments or the outbound shipments to the benefits of the transit rates; each group being entitled only to local rates. The lumber so shipped into Grand Rapids was not stopped there and treated according to any privilege granted by an existing transit tariff, and, on the contrary, was so disposed of at the transit point (Grand Rapids) as to forbid its being made the basis of a transit rate. Local rates from the points of origin of the lumber to Grand Rapids were paid by the consignees located in that city; and subsequently a transit rate was in every instance applied both to the inbound and outbound shipments, by exacting on account of the outbound shipments freight charges equal to the transit rates from the points of origin of these inbound shipments to the various destinations of the outbound shipments, and then paying back sums equal to the local rates previously paid on the inbound shipments.

What we have thus said in respect of all the transactions may be better understood by a statement of what was concededly developed under the first count; for the counts are all alike, save in immaterial details. March 8, 1911, at Little Falls, Minn., Soo Line car 17800, containing 48,800 pounds of "pine lumber," was consigned to the Dennis

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Lumber Company, Grand Rapids, and was transported from Mackinac over the line of the Grand Rapids & Indiana Railroad and delivered to the consignee March 11th. The Dennis Lumber Company, having previously paid the local freight rate ($97.60) and sold the lumber as "pine crating strips" to the Phœnix Furniture Company, Grand Rapids, delivered it to the latter company March 13th, and that company paid for the lumber and used it in Grand Rapids for "making crates to cover furniture." March 18th, the Dennis Lumber Company delivered to the defendant at Grand Rapids one car load of "rough lumber," 42,100 pounds, with a shipping order stating: "Through rate, 23 cents. Charges of Soo Line 17800 from Little Falls, 3/11/11, 48,-800 pounds, 20 cents—$97.60." And accompanying this order was the receipted bill (called "expense bill") for the freight so paid. The defendant treated this order and the receipted bill as entitling the Dennis Lumber Company to have the existing transit rate of 23 cents per 100 pounds, consisting of 16 cents on the inbound and 7 cents on the outbound shipments, applied respectively to 42,100 pounds of the inbound car load (because its weight was 6,700 pounds more than that of the outbound shipment) and the 42,100 pounds weight of the outbound car load; and the transit rates were accordingly applied—that is, 16 cents to the inbound and 7 cents to the outbound shipments. The outbound car, P. R. R. 85817, was consigned to Charles F. Shiels & Co., Cincinnati. By so applying the transit rates (including $3 transit charge, and also the local rate on the excess of 6,700 pounds just mentioned), the freight charge made against the consignee at Cincinnati was $113.-23. The consignee paid this amount to the defendant and charged it back to the Dennis Lumber Company; and the defendant then paid the latter company the amount of the local rate, $97.60, which it had previously paid on the shipment in the Soo Line car 17800—the rate clerk of defendant at Grand Rapids testifying: "We refunded the Dennis Lumber Company the amount of $97.60, which they had paid on the inbound car." The result of all this was to give to the Dennis Lumber Company the difference between the sum of the local rates and that of the transit rate (apportioned to the inbound and outbound shipments, as stated) from Little Falls to Cincinnati, to wit, $39.10; and the payment of this sum was charged in the indictment and found below to be a rebate.

It is conceded that the defendant and its connecting corporation lines, as named in the indictment, had at the times in question duly established all the rates, both local and transit, that are involved in the indictment; and that all these companies were subject to the act to regulate interstate commerce, and its amendments and supplements. The rates themselves are not in dispute; and, as applied to the facts of the present case, we do not understand that there is any difference between counsel touching the conditions under which the transit privileges and rates were available. Indeed, counsel for the railroad concedes that inbound lumber "which had been used locally or reconsigned to another point" did not fall within any proved transit privilege. Upon this subject the trial judge instructed the jury:

"* * * In no such case, either where the lumber was purchased by a third person and consumed by that person at Grand Rapids, or where it was forwarded to some point beyond Grand Rapids, could such a shipment be the subject of a transit privilege, because that did not come within the terms of the transit tariff; * * * and under this ruling of the court counsel concede that the shipments involved in this case and in the various counts of this indictment were not entitled to the transit privilege, and were not the subject of a transit tariff, so called."

There is no assignment of error to this portion of the charge. Hence, no question arises touching the nature and extent of the privilege intended to be created by defendant's transit tariff. The transit rate was in each instance lower than the sum of the local rates that were ordinarily applicable to such inbound and outbound shipments as these; and of these inbound shipments of lumber, ten were consumed at Grand Rapids, and the remaining four were there merely reconsigned to points beyond.[1] It results that the relations of each of these inbound shipments, both to shipper and carrier, had terminated, when they and the local rates paid on them were made the foundation of the transit shipments in dispute. And it is to be observed and borne in mind that the effort made here to defend the transactions in issue is not based upon any fact or claim of rightful use of any transit privilege. Turning now to the principal features of the defenses relied on:

[1] 1. Fatal variance is claimed. The theory of this claim is twofold: (a) That the offense charged in each instance was the giving of a rebate on the outbound shipment while the proof shows that it was given, if at all, on the inbound shipment; and (b) that the indictment avers violations alone of the local tariffs but the proofs show violations, if any, only of the transit tariffs. It will be noticed that this is not a challenge of the sufficiency of the indictment, but of portions of the evidence offered in its support. This evidence relates to the inbound shipments and to the transit rates and charges; exception was taken to its admission at the trial, and the rulings are assigned as error. As it seems to us, counsel's theory is untenable. It fails alike in either view to observe that the offense charged, and the proofs alluded to are vitally related. It also fails to give due effect to the comprehensive provision of the statute, which forbids employment of "any rebate, concession or discrimination," or of "any device whatever," respecting the transportation of property "at a less rate than that named in the tariffs published and filed by such carrier." 34 Stat. 587, 588. It is true that the outbound, not the inbound, shipments and the local rates thereon are described in the indictment; and that the offense alleged in each instance relates to the outbound shipments and local rates alone. We have seen, however, that the defendant collected of the shippers (through the consignees at destinations) enough to pay the transit rates and charges on both the inbound and outbound shipments, and then

[1] The inbound shipments so consumed in Grand Rapids were identified with and involved in the outbound shipments described in counts 1 to 6, both inclusive, and 8, 9, 10, and 12; and the four reconsigned inbound shipments were connected with the outbound shipments described in counts 7, 11, 13, and 14, and were respectively forwarded to Holland, Mich., St. Joseph, Mich., Kokomo, Ind., and Fairmount, Ind.

paid the shippers sums equal to the locals previously received of them on the inbound shipments. This method operated in every instance, in form, to convert strictly local shipments and rates, both inbound and outbound, into transit shipments and rates. It cannot escape attention, either, that the results attained through the formal exactions and repayments made touching the outbound and inbound shipments were essential elements of the outbound transactions. For otherwise there could have been no possible excuse for collecting transit rates upon the inbound shipments which had already been subjected to local rates.

[2, 3] Now to say that these facts are inadmissible is to deny that the outbound transactions are open to explanation; and yet they are distinct issues presented by the indictment. It is true that the method so resorted to, the device, is not set out in the indictment; but this was not necessary, since the device is not the offense denounced. Armour Packing Co. v. United States, 153 Fed. 1, 17, 82 C. C. A. 135, 14 L. R. A. (N. S.) 460 (C. C. A. 8th Cir.); s. c., 209 U. S. 56, 83, 28 Sup. Ct. 428, 52 L. Ed. 681. Thus counsel's objection is aimed against the proofs that at once describe the outbound transactions and also the device employed to carry them into effect. The natural tendency of the facts concerning the inbound shipments and the transit rates and charges was to disclose a scheme that was calculated alike to conceal and carry out the very thing charged in the indictment—to disclose the means used to accomplish the end in view; and, since these means entered into and formed a vital part of the outbound transactions, we are unable to see why the proofs were not admissible. Armour Packing Co. v. United States, before cited, 209 U. S. 56, 72, 28 Sup. Ct. 428, 52 L. Ed. 681; Cleveland, C., C. & St. L. Ry. Co. v. Hirsch, 204 Fed. 849, 853, 123 C. C. A. 145 (C. C. A. 6th Cir.). The execution of such a method clearly operated to transport the outbound lumber at less rates than those named in the local tariffs "published and filed" by defendant.

[4] Hence we pass by an objection urged that the amounts of the rebates stated in the counts of the indictment were not proved, with the remark that the precise sums alleged were not of the essence of the offense. The case in this respect must therefore fall within the general rule that it is sufficient if substantial amounts be proved. United States v. Harper (C. C.) 33 Fed. 471, 476, Circuit Judge Jackson and District Judge Sage concurring; Commonwealth v. O'Connell, 12 Allen (Mass.) 451, 453, 454; 1 Wharton, Crim. Ev. (10th Ed.) § 131, at page 357. The proofs pointed out, with the rest of the evidence, were submitted to the jury, under instructions to return a verdict for the defendant unless it was found that the concessions were intended to be made upon the outbound shipments.

It may be added that the usual tests of the necessary relations between an indictment and the evidence are, we think, to be found here. The indictment sets out: The regularly established local rates respecting each shipment from Grand Rapids to destination; the date and destination of each outbound shipment, the usual description of car, and the kind and weight of lumber transported; the interstate character of the carriers and the lines engaged in each movement; and the

plan of first collecting the regular rates, and then, through subsequent repayments, in effect transporting the lumber at less rates than those named in the tariffs. While the indictment might properly have contained more details, the essential elements of the offense are stated with such particularity as fairly to have informed defendant of what it must meet, and in the event of conviction or acquittal to enable it to plead the indictment in bar of any subsequent prosecution for the same offense. N. Y. Cent. v. United States, 212 U. S. 481, 497, 29 Sup. Ct. 304, 53 L. Ed. 613; Harrison v. United States, 200 Fed. 662, 673, 119 C. C. A. 78 (C. C. A. 6th Cir.); Foster v. United States, 178 Fed. 165, 171, 101 C. C. A. 485 (C. C. A. 6th Cir.); Standard Oil Co. of N. Y. v. United States, 179 Fed. 614, 618, 103 C. C. A. 172 (C. C. A. 2d Cir.).

[5] 2. It is contended that the refunds, as they are called, were not made knowingly. The argument is that defendant's agents who executed the outbound transactions did not know that the lumber in the inbound cars had been used locally or reconsigned at the transit point. We do not understand it to be claimed, however, that defendant did not have agents who knew these facts as well as all other details of the transactions. Concededly, papers and records were kept in the freight offices of defendant in Grand Rapids, which contained all the information upon the subject. These papers and records were made out by defendant's agents, were in their custody, and admittedly were accessible to the very men who conducted the outbound transactions; and, as illustrative of the pertinent facts so at hand, the disposition in each instance of the inbound shipments was known to and reported by the yardmaster and at least one of the car checkers. These men, as also the rate clerk, the freight agent, the cashier of the local freight office, and his assistant, testified, and while each did not know all the facts, it is plain enough that, if the composite knowledge so possessed by its agents was imputable to the defendant, its knowledge was complete. In the course of the charge the District Judge said:

"To warrant a conviction in this case you must find: First, that a rebate was given; second, that such rebate was given knowingly; third, that it was given with respect to the transportation of the lumber set forth in the indictment; and, fourth, that thereby such lumber was transported at a less rate than that set forth in the published and filed tariffs. So that the second question for you to determine, if you find in favor of the government upon the first question, is this: Was the rebate paid knowingly by the defendant?"

After calling the attention of the jury to a number of the witnesses who testified upon the subject, the court in substance stated that it was not necessary that one or two of these men should know all of the facts, but that:

" * * * The sum of the knowledge of those two men (referring to the rate clerk and the car checker) and others, other employés of the defendant, acting within the scope of their employment, constituted the knowledge of this defendant. * * * If you find that this defendant did not knowingly give the rebate in respect to the outbound shipment, it will be your duty to acquit the defendant. * * *"

Having in mind these instructions and the verdict, can it be rightfully said that the defendant did not knowingly commit the acts charged?[2] The Elkins Act, as amended June 29, 1906, provides (34 Stat. 588):

"In construing and enforcing the provisions of this section, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier, or shipper, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or shipper as well as that of the person."

The only change made by the amendment of this provision was to enlarge it so as to include shippers. In New York Cent. R. R. v. United States, 212 U. S. 481, at page 497, 29 Sup. Ct. 304, at page 308 (53 L. Ed. 613), it was claimed that this provision in its original form was unconstitutional, because it in effect made the crime of one person that of another and so deprived the latter of due process of law and the presumption of innocence; but there, as here, the railroad agents were not parties, and Mr. Justice Day said:

"There can be no question that Congress would have applied these provisions to corporation carriers, whether individuals were included or not. In this view the act is valid as to corporations. Berea College v. Kentucky, 211 U. S. 45, 55 [29 Sup. Ct. 33, 53 L. Ed. 81]."

In the course of the discussion which led to this conclusion, the learned justice said (212 U. S. 494, 495, 29 Sup. Ct. 307, 53 L. Ed. 513):

"It is true that there are some crimes which, in their nature, cannot be committed by corporations. But there is a large class of offenses, of which rebating under the federal statutes is one, wherein the crime consists in purposely doing the things prohibited by statute. In that class of crimes we see no good reason why corporations may not be held responsible for and charged with the knowledge and purposes of their agents, acting within the authority conferred upon them. * * * If it were not so, many offenses might go unpunished and acts be committed in violation of law where, as in the present case, the statute requires all persons, corporate or private, to refrain from certain practices, forbidden in the interest of public policy."

Counsel's argument will not bear the test of the statutory provision so sustained and construed. It overlooks the doctrine of imputability thus established; it considers only particular agents, who denied knowledge concerning the local use or reconsignment of the inbound lumber at the transit point, and so ignores the knowledge of other agents who confessedly knew these facts. It may for the purposes of the question be conceded that agents who were in truth ignorant of such facts could not themselves be successfully prosecuted, but it would not follow that the corporation could not. The statutory provision plainly fastens upon the corporation responsibility for the acts of all its agents, whose combined knowledge and conduct necessarily

[2] The question here is not whether evidence tending to show want of knowledge was erroneously excluded, but it is whether the evidence actually received, as a whole, tended to charge defendant with knowledge that the inbound lumber had been used locally or reconsigned at the transit point; and so the case differs in this respect from Standard Oil Co. of Indiana v. United States, 164 Fed. 376, 381, 382, 90 C. C. A. 364 (C. C. A. 7th Cir.).

affect the validity of any particular transaction that is executed by only some of its agents; if this were not so, the ordinary system of departmental corporate agencies could be used to frustrate the law. This may be seen, for instance, upon the slightest consideration of the outbound transactions.

[6] The concession that inbound lumber consumed or reconsigned at the transit point cannot rightfully be made the foundation of a transit shipment is tantamount to saying that, before the benefits of a transit shipment can be accorded, some relation must in fact exist between the proposed outbound shipment and an inbound shipment that is capable of being forwarded under the transit tariff. Since no such relation whatever is here claimed, the requisite degree of relationship need not be considered. It results, however, that the transit tariff gives a conditional privilege; that is, a special privilege, which is available only under certain terms and conditions (Diamond Mills v. Boston & Maine R. Co., 9 Interst. Com. Com'n Rep. 311, 315; Barnes, Interstate Transp. § 216, at p. 386); and for services rendered and expenses incurred in the granting and exercise of such a privilege the carrier is entitled to reasonable compensation (Southern Ry. Co. v. St. Louis Hay Co., 214 U. S. 297, 301, 29 Sup. Ct. 678, 53 L. Ed. 1004). Thus the privilege, besides being conditional, may be of mutual profit to carrier and shipper; certainly no one can both receive such benefits and shut his eyes to the existence or not of the conditions essential to the granting of the privilege. Therefore, to hold that the carrier may establish a transit tariff and then shield itself against responsibility for granting its privileges where the conditions do not warrant it, upon the theory that its particular agents who conducted the outbound transactions did not acquaint themselves with the real conditions, while others of its agents did possess such knowledge, would be, as it seems to us, to subvert alike the letter and the intent of the statute. It follows that defendant must be held to have knowingly granted the refunds; and the necessary effect of this was purposely to violate the statute. 34 Stat. 588; Armour Packing Co. v. United States, 209 U. S. 56, 86, 28 Sup. Ct. 428, 52 L. Ed. 681; Chicago, St. P., M. & O. Ry. Co. v. United States, 162 Fed. 825, 842, 843, 90 C. C. A. 211 (C. C. A. 8th Cir.); Ellis v. United States, 206 U. S. 246, 257, 27 Sup. Ct. 600, 51 L. Ed. 1047, 11 Ann. Cas. 589.

[7] 3. It is claimed that as soon as defendant discovered its errors, so-called, it collected from all the shippers, except one that refused to pay, amounts sufficient to cover the full tariff rates, and so relieved itself of every charge made in the indictment; and it is true that these sums were repaid. The charge of the court upon the question so raised was in effect that the offense should be regarded as consummated and beyond recall or not, and the verdict rendered against or in favor of the defendant, according as the jury should conclude that defendant acted with or without knowledge of the facts involved in the transactions in dispute; and we are constrained to believe that this was as favorable a presentation of the rights of defendant as the law would permit. For reasons already stated concerning defendant's knowledge, we must regard this question as concluded by the verdict.

[8] In this connection we may speak of an assignment of error touching the exclusion of evidence offered by defendant to show all the transit shipments that were made during the period involved in the 14 shipments. It seems that the shippers of the lumber contained in the 14 outbound cars made 112 additional shipments which were accorded the transit privilege during the months of March, April, and May, involved in the indictment; and the insistence is that, since the 14 outbound cars were only a small portion of the total transit shipments made, the presence of the whole number would support defendant's claim that the disputed shipments were allowed without any intention of violating the law. It is plain that, unless the excluded shipments were admittedly entitled to the transit privilege, their introduction would confuse the issues concerning the 14 shipments; and the absence of such admission would warrant their exclusion as irrelevant and so immaterial. But conceding that they were entitled to the transit privilege, if we are right in the holding herein that this privilege is conditional and that defendant was chargeable with knowledge that the condition had not been performed, no prejudicial error was committed by excluding the other shipments. It might be that their presence would aid in excusing the agents who executed the outbound transactions, but not the defendant.

[9] 4. The last objection is that there were not more than 10 offenses, if any were committed, because "there were 10 payments of refunds on 14 shipments." The court imposed a fine of $1,000, upon each of the 14 counts—a total of $14,000. Special attention must now be given to the form of allegation contained in each of the counts, and to the lack of relationship between the transactions they describe. The offense charged in each count is in substance stated in the margin.[3] Each outbound car load was transported under a distinct shipping order. This order was accompanied by the receipted bill, called "expense bill," for freight charges which had been previously paid by the shipper on an inbound shipment; and this expense bill was made the basis of a transit shipment of the outbound car load. A memorandum was at the same time made by defendant at Grand Rapids, which, among other things, showed the amount of the refund that was to be made later; that is, the inbound freight charges represented by the expense bill. Each refund was paid by draft in the month succeeding the shipment, except one that was paid the second succeeding month; and four of the payments each included two car loads. The lack of relationship between the two shipments that were covered by each of the four drafts may be further emphasized by the facts that these shipments

---

[3] That on a stated date defendant received from the shipper a car load of lumber for transportation from Grand Rapids to a particular destination; that defendant did immediately thereafter transport the lumber (over its road and connecting lines) and collect the "lawful charges" at destination; that on a later date named defendant at Grand Rapids "did knowingly and willfully offer, grant and give" to the shipper "a rebate," in an amount specified, "in respect to the transportation of such property * * * whereby such property was transported * * * at a rate and charge less" by the sum so paid "than the rate and charge * * * named in the schedule and tariff * * * published and filed. * * *"

·were made to different consignees, except two and they were made on different dates.

Concededly the 10 drafts completed 10 of the offenses charged; but it is insisted that the inclusion of a second car load in four of the payments operated in each instance to complete only one offense, not two offenses. Now it will be recalled that the pertinent language of the ·charge made in each count is that the defendant "did   *   *   *   offer, grant and give   *   *   *   a rebate," and it should be stated that the date alleged in respect thereto corresponds in each instance with the date of payment of the rebate alleged. However, if it was permissible to allege and prove a method of rebating, which involved the offering, granting, and giving of rebates, it is clear enough that the proofs tending to show adoption of the previously paid inbound rates as "expense bills," their entries in defendant's·books as refunds to be made later, and their.subsequent payment, made a case of 14 offenses. If such a course was not tenable, then two independent transactions, which were separately initiated and step by step executed down to the point of payment, may·in effect be merged into one transaction and one offense simply by ignoring the preconceived device and employing one sum, instead of two, to close both transactions. Here the joinder of payments was obviously a matter of convenience, and the only natural inference is that they were intended to be appropriately divided and applied to the transactions to which they respectively belonged; and as we read the decisions, in the light of their facts, there is nothing in the law to forbid observance of that intent in an indictment and prosecution.. This is not saying that payment is not necessary to complete such offenses (New York Central R. R. v. United States, supra, 212 U. S. at page 498, 29 Sup. Ct. 304, 53 L. Ed. 613).; and to hold that these payments did not each complete two distinct transactions, and consequently two offenses would be to ignore and defeat the clear purpose of the payments themselves. The present case in this respect is quite like that of the United States v. Standard Oil Co. of N. Y. (D. C.) 192 Fed. 438; and Judge Hazel's conclusion and reasons as there stated seem to us to be sound.

In view of the opinion in that case, it is not necessary to state the differences between the present case and the cases there cited and distinguished; and this is true· of the earlier opinion of Judge Hazel, and its affirmance, in Standard Oil Co. of New York v. United States, 179 Fed. 614, 625, 103 C. C. A. 172 (C. C. A. 2d Cir.). The case of United States v. Stearns Salt & Lumber Co. (D. C.) 165 Fed. 735, differs from the instant case in that the proofs here show an express agreement for refund at the time of each individual shipment; and no question concerning the form of the indictment as respects this feature is raised. We think United States v. Bunch (D. C.) 165 Fed. 736, is distinguishable upon the same theory. We do not discover that the Supreme Court has passed upon the precise question thus involved.

Upon the whole, we are convinced that the judgment below must be affirmed.