MICHIGAN CENT. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. October 2, 1917. On Motion for Rehearing, December 4, 1917.)

No. 2859.

1. CARRIERS &#11093;26—CARTAGE TARIFF—LIABILITY FOR DEMURRAGE.

Under the provision of a cartage tariff that shipments so handled will not be subject to car service or storage service accruing through the company's failure to make delivery within specified free time, goods subject to cartage tariff are not exempt from demurrage, unless the failure to make delivery within the specified free time is that of the company.

2. CARRIERS &#11093;26—CARTAGE TARIFF—DEMURRAGE—"DELIVERY."

"Delivery," within the provision of a cartage tariff that shipments so handled will not be subject to car service or storage service accruing through the company's failure to make delivery within the specified free time, is the cartage delivery to be made by the company's cartage agent from the car duly placed on the delivery tracks to the terminal cartage point.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Delivery.]

3. CARRIERS &#11093;26—CARTAGE TARIFF—DEMURRAGE—FAULT OF RAILROAD OR CONSIGNEE.

Failure of the company's cartage agent to make delivery of the contents of cars within the free time allowed after the cars were placed on the delivery track was not that of company, so as, under the cartage tariff, to free the consignee from liability for demurrage, where it was because the consignee was not ready for their contents, and instructed the cartage agent, who was willing and ready to seasonably unload and deliver every car, to unload and deliver other cars, and so due to the consignee's fault; and this, though the cars had been placed on the delivery track in an order different from that of their shipment, in which order the consignee wanted their contents, any claim of the consignee on this account being separate from that of liability for demurrage.

4. CARRIERS &#11093;26—DEMURRAGE TARIFF—"RAILROAD ERROR OR OMISSION."

Provision of a demurrage tariff that no demurrage charges shall be assessed for detention of cars through railroad errors or omissions refers to such errors and omissions after placement of the cars on delivery track and notice thereof.

5. CARRIERS &#11093;38—OFFENSES—DEMURRAGE—KNOWLEDGE.

Under the rule that it will be charged with the sum of the knowledge of its agents within the scope of their respective functions, a railroad knowingly commits the offense of not assessing demurrage charges, where the traffic officials ignore the plain declaration of the cartage tariff under which the shipment is made that it is exempt from demurrage charges only if the failure to make the terminal delivery is that of the railroad, and the cartage agent knows that the cars are being held on the delivery tracks merely because the consignee will not accept unloading.

6. CARRIERS &#11093;38—DEMURRAGE—BUNCHING.

Under provision of a demurrage tariff for extra free time in case of bunching, as the direct result of the act or neglect of the carriers, bunching as the result of the consignee's previous fault in not accepting will not avail.

7. CARRIERS &#11093;26—DEMURRAGE—NOTICE.

Though a demurrage tariff contemplates a notice of arrival of cars and a notice of placement, any notice of placement agreed on by the parties

is sufficient to start the running of time, irrespective of sufficient preliminary notice of arrival.

8. CRIMINAL LAW ☞1168(4)—HARMLESS ERROR—FAILURE TO WITHDRAW EVIDENCE.

Failure to directly and clearly withdraw evidence bearing only on issues withdrawn cannot be complained of, where its retention was not likely to prejudice the jury in the determination of the simple questions remaining.

9. CARRIERS ☞38—FAILURE TO ASSESS DEMURRAGE—PENALTY.

The trial court, in deciding what penalty to impose for carrier's failure to charge $60 demurrage on 12 cars, for which it was convicted, could consider discrimination disclosed, for which there could be no conviction till the Interstate Commerce Commission had passed on it, or even if it did not violate the letter of any demurrage or other tariff.

Evans, District Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

The Michigan Central Railroad Company was convicted of failure to observe published tariffs, and brings error. Affirmed.

Two indictments were returned, in the court below, one of which charged the plaintiff in error (hereinafter called the railroad) with giving a concession or discriminatory privilege in regard to transportation, in violation of section 6 of the act of February 4, 1887 (24 Stat. 380, c. 104) as amended June 29, 1906 (34 Stat. 586, c. 3591, § 2 [Comp. St. 1916, § 8569]), and the other of which charged a failure to observe the published tariffs, in violation of the act of February 19, 1903 (32 Stat. 847, c. 708 [Comp. St. 1916, §§ 8597–8599]). Each indictment contained 30 counts, and the same numbered count of each indictment referred to treatment given to one and the same carload shipment. Both cases were tried as one. At the conclusion of the trial, the United States entered a nolle prosequi as to the indictment for giving a concession. Upon the indictment for not observing the tariffs, the court instructed a verdict for the railroad upon 18 counts, and left to the jury the issue upon the other 12 counts. The jury found the railroad guilty on each of these counts, and from the judgment imposing fines thereon the railroad brings this writ of error.

The case grows out of the great congestion of railroad traffic existing in and about Detroit during the summer of 1912. The Fireproofing Company manufactured building tile at a point in Ohio, from which the Hocking Valley and Michigan Central had a joint through line to Detroit. It secured a contract for the sale of a large quantity of its product in Detroit, to be delivered by it at a building there in process of erection. The railroad solicited the transportation of this freight, and negotiations were had which resulted in an arrangement that the freight should be shipped by this route, rather than by other competing ones. It had been estimated that the tile would be needed on the building at certain times, and it is accurate enough to say that the various cars were shipped from the point of origin, consigned to the Fireproofing Company, at Detroit, and in due time for delivery upon the job at the estimated dates. The building operations were delayed, the tile could not be used at the expected times, there was no storage place in or at the building, and the consignee had no warehouse or storage place at Detroit. Either for this reason, or because of the freight congestion, which resulted in more or less traffic chaos, or for both reasons, these cars were for a long time in the possession of the railroad after reaching the Detroit district. The railroad had at least three yards. One, outside the city, was used generally for breaking up and distributing; one, at Fourteenth street, was of large extent, and was used mainly for storage pending delivery upon local industrial or team tracks; and one, at Third street, was used for team track delivery. It was

necessary that these cars of tile be set on the last-named track.    Many of them were held a considerable time at the first or second of these yards, and were treated as still in transit, though notice of arrival was given to the consignee.    Further notice was given after the cars were set upon the delivery track.    After this setting, and after notice thereof, there was, in many instances, a further long delay before the cars were unloaded.    It was the theory of the first-named indictment that these delays before placement were for the benefit of the consignee, because it was not ready to receive, and amounted, practically, to a storage privilege or concession, which was not permitted by the published tariffs, and was therefore forbidden.    It was the theory of the railroad that these delays were caused by the traffic congestion, which was beyond its control, and that they were not, either in form or in substance, a concession to the consignee.    Since this indictment was voluntarily dismissed, the subject need not be followed.    Upon the second indictment, it was the theory of the prosecution that the published tariffs required the payment by the consignee and the collection by the railroad of a demurrage charge of $1 per day for each day of delay after the expiration of a fixed time, and that the published demurrage tariff had not been observed as to each one of the cars in question.    As to the 18 cars, the court below held that there had been no delay which violated the provisions of the demurrage tariff.    As to the 12 cars, it was the railroad's theory both that the specified time had not elapsed and that the time provisions of the demurrage tariff were generally inapplicable for the reasons to be stated.

There were in force at this time, by reason of due posting and publishing and acquiescence by the Interstate Commerce Commission, two tariffs which are of importance here.    One is known as the cartage tariff, creating a cartage agent; the other as the demurrage tariff.    So far as possibly pertinent, they are copied at the end hereof.    It is undisputed on this record that, before the arrangement for railroad transportation was made, the shipper and the railroad, through its soliciting agent, and the cartage agent, had a conference at which the price of cartage delivery was fixed, and it was fully agreed and understood that under this cartage tariff the building tile to be shipped would be delivered by this cartage agent at the building where the material was to be used, and that the liability of the railroad company, as a carrier, continued until such delivery was made, and also that formal notice that these shipments were to be made under the cartage tariff was given pursuant to section 5 thereof before the shipments began.

At the trial the railroad company contended that it had not violated the demurrage rules, since it was expressly provided that they should not apply to cases governed by the cartage tariff.    The trial court held that, since building tile was freight of the sixth class or under, it was excepted from the cartage tariff, and hence no defense could be based thereon.

Frank E. Robson and J. W. Dohany, both of Detroit, Mich. (Henry Russel, of Detroit, Mich., of counsel), for plaintiff in error.

Clyde I. Webster, U. S. Atty., of Detroit, Mich., August G. Gutheim, Sp. Asst. U. S. Atty., of Detroit, Mich., and John E. Kinnane, U. S. Dist. Atty., and J. Edward Bland, Asst. U. S. Dist. Atty., both of Detroit, Mich.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge (after stating the facts as above).    [1] The question chiefly argued before us was that upon which the case turned below, viz., whether the cartage tariff applied at all to these shipments.    Another form of this question is whether the Ferguson Company, in the team delivery of the contents of the 12 cars to which this case was finally reduced, acted as the agent of the railroad pursu-

ant to its tariff designation as cartage agent, or whether it acted as agent of the consignee pursuant to the bargain between them as to the price of hauling. We have concluded that the record does not present this broad question so as to require its decision. The provision of the cartage tariff is:

" * * * Shipments so handled will not be subject to car service or storage charges, accruing through failure on part of this company to make delivery within specified free time."

It is plain that the exemption from demurrage does not reach either all goods subject to the cartage tariff or even any goods subject to that tariff, unless the failure to make delivery within the specified free time was the failure of the company. For the purposes of this opinion, and without any decision to that effect, we assume that the railroad, through its cartage agent, had, pursuant to filed and published tariffs, contracted to deliver these shipments, by team or truck-hauling, to and at the building where the consignee was to use them, and hence there would seem to be the further assumption that the company had failed to make the agreed delivery; but, for the reasons to be stated, this further apparent assumption must be rejected.

[2] We first observe that, since paragraph 5 in the cartage tariff, from which we have quoted, and since the demurrage tariff, which is thus brought into consideration, both have reference solely to the failure to unload a car for more than 48 hours after notice that the car has been placed on the delivery tracks, it necessarily follows that, when this paragraph 5 refers to the "failure on the part of this company to make delivery within specified free time," the "delivery," to the making of which this clause refers, is the cartage delivery to be made by the company's cartage agent from the car duly placed and to the terminal cartage point. This clause, in this situation, cannot refer to any other kind of delivery.

[3] The undisputed testimony shows that, as fast as the cars were placed upon the team tracks, the consignee was notified; that thereupon the consignee, knowing by the number of the car the particular material which it contained, instructed the Ferguson Company what car to unload and deliver; that the Ferguson Company was constantly willing and ready to unload and deliver every car so placed, and within 48 hours after placement; and that the only reason why the 12 cars finally involved were allowed to stand more than 48 hours was that the consignee was not ready to use that particular material, and either had no place to store it or did not wish to handle it twice. In view of the daily conduct of the Ferguson Company and of the consignee, the situation is just the same as if the Ferguson Company had expressly offered to unload and deliver each one of these 12 cars within the specified free time, and as if the consignee had expressly said:

"We refuse to accept it; you must hold this car on the tracks until we are ready."

Such a situation does not disclose failure on the part of the company to make delivery, within the proper meaning of paragraph 5. Of course, in a certain broad sense, since it was the duty of the company

to make delivery (under our assumption), and since delivery was not made, it may be said that the company failed; but the question here must be as to the relative duties of the two parties. Demurrage is assessed for the default of the consignee in not unloading. This exemption from such assessment becomes reasonable only upon the theory that it was intended to exempt where the nondelivery was due to the fault of the company rather than to the fault of the consignee; and although this comparative standard is not expressed in words, we have no hesitation in deciding that it must be implied, and that the demurrage and the cartage tariffs, considered together, are open to no other reasonable construction.

Our conclusion that the undisputed testimony shows the situation above recited has been reached after some preliminary doubts. The record contains considerable evidence by which the consignee undertakes to put the blame upon the railroad and by which the railroad undertakes to assume that blame; but all this evidence, upon analysis, resolves itself into a claim that the railroad was at fault for placing these cars upon the delivery track in a consecutive order so vitally different from the consecutive order of original shipment that the consignee was under no obligation to unload them in even approximately the order of their placement. The consignee's evidence showed—indeed, it is practically undisputed—that there were some 20 different sizes and shapes of these tile required for this building, that it was essential to use them in the building in a certain order, that they were shipped from the factory in this order, but that they were so placed upon the team track that, e. g., tile for the tenth floor were thus delivered before tile for the first floor, which had been shipped 90 days before the other. Even if it were conceded that shipments might be delivered to the consignee in such gross inversion of the order of shipment by the consignor as to be a breach of the railroad's contract for proper carriage, it would not follow that the consignee might therefore disregard the published demurrage tariffs, and refuse to accept and unload the cars in the order of their arrival or placement. The whole body of demurrage rules and regulations is upon the theory that railroad tracks must not be used by shippers for warehouse purposes, and it cannot make any difference in the application of these tariffs that the shipper has no warehouse, or that a distorted order of delivery may make necessary a storage by the consignee or a handling otherwise unnecessary. If for this he may have a claim against the railroad, that would be another question. Darling v. Pittsburgh, etc., Ry., 37 Interst. Com. Com'n R. 401; and see Chicago, etc., R. R. v. Kirby, 225 U. S. 155, 166, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501.

There are two matters on the record which, while not controlling, yet tend to confirm the conclusion that there was nothing to go to the jury in dispute of the proposition that the final and vital delay was not because the Ferguson Company did not deliver, but was solely because the consignee would not receive. The first is that, as soon as the matter came to the attention of that counsel for the railroad who had special supervision of matters connected with the interstate commerce law, he directed that demurrage be collected for these cars; but this was,

concededly, at a time too late to have any direct bearing upon the main question. The other is that the trial judge, in his charge to the jury, assigned this as one of the reasons for his conclusion that the cartage tariff was not applicable; and to that portion of the charge which stated this fact as if it were undisputed the railroad took no exception, nor did it in any way call the attention of the trial judge to a claim that there really was an issue of fact on this point.

[4] Rule 8 of the demurrage tariff, when extended to clause (e), says, in effect, that no demurrage charges shall be assessed for detention of cars through railroad errors or omissions. Just as with reference to clause 5 of the cartage tariff, we observe that, since no demurrage can be assessed until after placement and notice, this clause (e) must refer to railroad errors and omissions occurring after that time; and, accordingly, the clause can have no substantial effect upon the situation here.

[5] It is urged that both the railroad traffic officials and the consignee acted in good faith in not assessing or paying demurrage charges, and took this course in the belief that the cartage tariff applied to these shipments, and that where the cartage tariff applied there could be no demurrage. It is therefore said that the railroad did not "knowingly" commit the offense alleged. If the tariff had been one open to two constructions, and the traffic officials in good faith had adopted that construction which the courts finally decided erroneous, the contention of the railroad in this particular would require further consideration; but here the traffic officials did not merely reach an erroneous conclusion as to whether the cartage tariff affected such shipments as these— indeed, we are assuming that they reached the right conclusion on that subject. What they did was to ignore the plain declaration of the cartage tariff that even as to those shipments to which it applied demurrage must be collected unless the failure to make terminal delivery was the failure of the railroad company. It is of the essence of the railroad company's position that the Ferguson Company was its agent in the matter of this delivery, and in that matter and to that extent stood in the place of the railroad company. The Ferguson Company had full knowledge of the fact that the cars were held on the track merely because the consignee would not accept unloading; and we conclude that the case was one, as the trial judge thought, for the application of the rule that the sum of the knowledge of the railroad agents, within the scope of their respective functions, is sufficient to satisfy the statutory condition that an offense exists only when the forbidden act is done "knowingly." Grand Rapids, etc., Ry. v. United States (C. C. A. 6) 212 Fed. 577, 586, 129 C. C. A. 113.

[6] The instructions of the court upon the subject of "bunching," as covered by demurrage rule 8, were without substantial error. Clause (b) 2 contemplates a claim by the consignee for more free time; but where the free time is allowed without claim, and the only question is whether the allowance was erroneous, the absence of claim is not material. The substance of this rule, as it must be applied to so much of this case as was finally submitted to the jury, is that if the cars were placed on the delivery track in accumulated numbers and in excess of

daily shipments, and if this was the direct result of the act or neglect of the carriers, the consignee was entitled to a specified extension of free time, and that for detention within such extended time no demurrage should be assessed. The court properly charged that the jury must consider whether this bunching was the result of the act of the carrier or the result of the consignee's previous fault in not accepting, and so in compelling the accumulation; and this fault of the consignee might be found with reference to the accumulation upon the Fourteenth street storage tracks as well as in other matters. These 12 cars were placed on the team track from July 12th to August 5th, and the conduct of the parties before or during this period was pertinent. The embargo declared July 6th was a declaration or claim (in this case, an admission) by the railroad that the consignee was at fault.

[7] The demurrage rules contemplate, as to cars which had the history of these 12, a notice of arrival and a notice of placement. We think the court correctly held that any notice of placement, which the parties agreed upon as sufficient, would be enough to set the time in motion, and that, as to these cars, placed upon that delivery track which had been agreed upon, the existence of a sufficient preliminary notice of arrival became immaterial when the superseding notice of placement was given.

Except for the disputes that existed, and which were submitted to the jury, as to who was responsible for the bunching, and as to whether the parties had agreed upon a form of notice of placement, the controlling facts were undisputed. It therefore becomes unnecessary to examine several complaints arising during the progress of the trial or concerning specific instructions.

[8] The court finally withdrew from the jury the whole theory of "constructive placement," which phrase referred to a holding of the cars upon the storage tracks, as distinguished from "actual placement" upon the delivery tracks; and the court submitted to the jury only the two disputes just mentioned, as bearing upon the duty to collect demurrage after actual placement. The considerable body of testimony which had accumulated regarding constructive placement, and other issues which had become immaterial, was not withdrawn from the jury as directly and clearly as might well have been done; but we cannot see how its retention in the record was likely to prejudice the jury in deciding these two rather simple matters—the only two about which there was any room for more than one conclusion.

[9] It is said that the fine imposed, $24,000, was excessive punishment for the failure to charge about $60 demurrage, and that the circumstances of the case and certain remarks by the trial judge sufficiently indicate that the greater part of this penalty was assessed, not for the offenses of which the defendant had been convicted, but for those of which it had been acquitted, or concerning which the indictment had been dismissed. There is superficial force in this complaint, but it is only superficial. The testimony had disclosed an aggravated case of violation of the very often declared purpose and scope of the law forbidding discrimination or special concessions. As many as 50 cars at once out of these tile shipments had been held for days upon

storage tracks, because the consignee was not ready for them, and this seemed to be one of the typical, if not one of the extreme, instances of the practices which had materially contributed to the congestion that had swamped the railroad service. Even though this involved a discrimination for which there could be no conviction until the Interstate Commerce Commission had passed upon it, or even if it did not violate the letter of any demurrage or other tariff, it was conduct which the trial judge could rightfully take into consideration when deciding what penalty to impose for those offenses upon which there had been a conviction; and, in the amounts which he fixed, he did not exceed the limits of discretion. In this comment, we pass by the obvious consideration that, if the penalty imposed is within the statutory limits, it must be an extraordinary case—if, indeed, there could be any—which would justify an appellate court in interfering.

The judgment of the court below is affirmed.

### Cartage Tariff.

### M. R. C. No. 765. I. C. C. 4005.

Michigan Central Railroad Co. Local Freight Tariff of Cartage Charges at Detroit, Michigan, Issued March 20th, 1911, Effective April 24, 1911.

1. The freight tariff rates of this company and its connections covering traffic to or from Detroit, Mich., are exclusive of the cost of cartage, but for the convenience of the public and for the purpose of securing uniformity of practice and to avoid unjust discrimination as between individuals, as required by law, this company has appointed the E. Ferguson Company, Limited, as its authorized cartage agents for the city of Detroit, and will be prepared to perform the cartage service from and to its freight houses and team tracks and the stores and warehouses of the public within the city limits.

2. The following rates will be collected for cartage to or from store or warehouse door when cartage is performed by the E. Ferguson Company, Limited:

Less than carload lots of 2¢ per 100 pounds (subject to exceptions shown below), minimum charge for any one consignment 15¢.

Carload package freight (subject to exceptions shown below), at 1½¢ per 100 lbs.

Exceptions:

[Here follows list of many articles, not including building tile, and ending with:]

Any article weighing over one thousand pounds.

All freight rated sixth class and lower.

Property named and referred to under head of "Exceptions," will be carted by the E. Ferguson Company, Limited, under their own arrangements with shippers or receivers.

3. The aforesaid charges as to carloads are to cover the collection and delivery of complete consignments only from one shipper to one consignee. Where the consignee wishes his consignment delivered to other parties than himself, thus involving the separate accounting and collection of charges, then the cartage charge applicable to less than carload traffic will apply. This company will only make one expense bill for each consignment.

4. This company will not bill forward for collection from consignees the cartage charge at Detroit on outward traffic, but collect it from the shippers.

5. Where standing orders covering all shipments or single orders covering particular shipments are placed with this company previous to arrival of shipments authorizing this company to deliver under above rules, shipments so handled will not be subject to car service or storage charges accruing through failure on part of this company to make delivery within specified free time; and where orders are given subsequent to arrival of shipment, same will be subject to car service and storage rules as outlined in M. C. R. R. I.

C. C. No. 3578, M. R. C. No. 574, R. C. O. No. 256, I. R. C. No. 275, C. R. C. No. 1357, G. F. D. No. 7776, supplements thereto and subsequent issues thereof and free time will be computed same as shipments not handled under this tariff.

### Demurrage Tariff.

Found in I. C. C. No. 3578, as follows:

Car service rules applicable to all Michigan Central railroad stations in the state of Michigan, on both interstate and intrastate business, effective May 1, 1910.

Rule 1. *Cars Subject to Rules.* Cars held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose are subject to these demurrage rules.

    *    *    *    *    *    *    *    *    *    *

Rule 2. *Free Time Allowed.* (a) Forty-eight hours (two days) free time allowed for loading or unloading on all commodities.

    *    *    *    *    *    *    *    *    *    *

Rule 3. *Computing Time.* Note.—In computing time Sundays and legal holidays (national, state and municipal) will be excluded. When a legal holiday falls on a Sunday, the following Monday will be excluded.

(a) On cars held for loading, time will be computed from the first **7 a. m.** after placement on public delivery tracks.

(b) On cars held for orders, time will be computed from the first **7 a. m.** after the day on which notice of arrival is sent to consignee. On cars held for unloading, time will be computed from the first 7 a. m. after placement on public delivery tracks and after the day on which notice of arrival is sent to consignee.

    *    *    *    *    *    *    *    *    *    *

Rule 4. *Notification.* (a) Consignee shall be notified by carrier's agent in writing, or as otherwise agreed to by carrier and consignee, within twenty-four hours after arrival of cars and billing at destination, such notice to contain point of shipment, car initials and numbers, and the contents, and, if transferred in transit, the initials and number of the original car. In case car is not placed on public delivery track within twenty-four hours after notice of arrival has been sent, a notice of placement shall be given to consignee.

    *    *    *    *    *    *    *    *    *    *

Rule 5. *Placing Car for Unloading.* (b) When delivery cannot be made on specially designated public delivery tracks, on account of such tracks being fully occupied, or from other cause beyond the control of the carrier, the delivery will be made at the nearest available point accessible to the consignee and the consignee so notified.

    *    *    *    *    *    *    *    *    *    *

Rule 7. *Demurrage Charge.* After the expiration of the free time allowed, a charge of $1 per car per day, or fraction of a day, will be made until car is released.

Rule 8. *Claims.* No demurrage charges shall be assessed under these rules for detention of cars through causes named below. If through error, demurrage charges are assessed or collected under such conditions, they shall be promptly cancelled or refunded by the carrier.

    *    *    *    *    *    *    *    *    *    *

(b) Bunching.

2. Cars for unloading or reconsigning.—When as a direct result of the act or neglect of carriers, cars destined for one consignee, at one point, and transported via the same route, are bunched in transit and delivered in accumulated numbers in excess of daily shipments, claim to be presented to the carrier's agent before the expiration of the free time. The consignee shall be allowed such free time as he would have been entitled to had the cars been delivered in accordance with the daily rate of shipment.

    *    *    *    *    *    *    *    *    *    *

(d) Delayed or improper notice by carrier.

Note.—When notice has been given in substantial compliance with the requirements as specified by the rules, the consignee shall not thereafter have

the right to call in question the sufficiency of such notice unless within twenty-four hours after receiving the same he shall serve upon the delivering carrier a full written statement of his objections to the sufficiency of said notice.

(e) Railroad errors or omissions.

EVANS, District Judge (dissenting). I agree with much that is said in the opinion, but some questions, which seem to me to be of a decisive character, were not alluded to. One hundred and fifteen errors were assigned, many of which were not argued, and most of which were probably speculative, but among those argued were those which raise the questions to which I have referred. In order to state clearly the grounds of the conclusion I have reached it is necessary to make a preliminary statement of certain facts shown by the record.

Two indictments were returned against the railroad company, and they were heard together as one case. The trial before a jury began on March 2, 1915, and a great deal of testimony was heard. The second of the indictments was numbered 5435, and charged 30 separate offenses under the interstate commerce law. The first of the indictments, numbered 5434, also contained 30 counts, 12 of which charged that in 12 separate instances, and in respect to each of 12 separate cars the railroad company had failed to collect demurrage charges, these separate failures being alleged to be concessions in rates of transportation unlawfully made to the shipper, viz., the National Fireproofing Company. After the trial had progressed for seven days indictment No. 5435 was withdrawn. The trial continued 15 days longer. At its conclusion, and after the argument to the jury, the court dismissed 18 of the counts of that indictment. Upon the remaining 12 counts (each of which, properly considered, covered the simple charge of failing to collect demurrage on a separate car) the case was submitted to the jury, and a verdict of guilty was returned upon each count. The charges efficiently made in these 12 counts are very simple, and presumably were of themselves of very easy solution, but in respect to the whole case a great mass of testimony had been introduced, a large part of which was objected to, and in many instances exceptions to the ruling of the court had been taken by the railroad company. These exceptions are covered by the assignments of error. The 12 counts, separately, contained exaggerated statements of the number of days for which, in respect to each car the demurrage charges had not been collected. This exaggeration was probably based upon the indefensible theory of "constructive placements" of cars. In point of fact, the record clearly shows that the real average was a little less than four days for each of the 12 cars. The testimony to which we have referred was more directly addressed to the charges made in counts other than the 12 now involved, though in its general terms it might seem to reach every phase of the case, but neither when indictment No. 5435 was withdrawn nor when the court, after the argument before the jury, took out of the case 18 of the counts in indictment No. 5434, and told the jury not to regard any of those counts, was anything done by the court to show the jury that much of the testimony that had been heard should not have any weight in the con-

sideration of the issues on the 12 counts submitted to them. Our reason for saying this will be more clearly indicated further along.

In respect to the 12 counts it is certain that when they were submitted to the jury all the evidence previously heard remained in the case, although much of it had been objected to and the objections had been overruled and exceptions taken. So far as the jury could understand, all this testimony bore upon the remaining counts, and they had no guidance for discriminating its inapplicability. The parts of the evidence which were obviously prejudicial were: First. That respecting certain embargoes established July 6, 1912, which might have greatly influenced the jury in what they did. Everything respecting these embargoes occurred some time after each of the cars referred to in the 12 counts had reached Detroit in due course. The question of an embargo upon freight outside of Detroit could not, we think, by any possibility, have been competent in respect to demurrage charges upon freights that had reached Detroit before an embargo was laid. Though, prima facie, incompetent, it remained in the case, and as we shall point out, was effectively used in another connection. Second. The numerous letters of Bernet, Ingalls and Rowley. This testimony, all left in the record and never taken from the jury, was bound to influence that body in its deliberations; and, third, the testimony relative to the inability of the National Fireproofing Company to unload shipments—in other words, testimony in respect to a certain congestion of traffic and in respect to the theory of "constructive placements."

Not only did the court, over the objections of the defendant, admit the testimony as to the embargoes of July 6, 1912, and later, to which we have referred, but by its charge made after all but the 12 counts had been eliminated, the jury were expressly instructed to consider that testimony in connection with the other testimony heard at the trial. To this part of the charge the defendant excepted and assigned error upon it. It seems to me that this was not only to the probable, but to the manifest, prejudice of the defendant, as all the embargoes related to matters outside of Detroit, and were issued after the delivery in that city of all the 12 cars. Under these circumstances this testimony and the charge upon it must have confused and misled the jury. Especially was this testimony also inadmissible because no allegation respecting the embargoes is made in the 12 counts.

The indictment in each of the 12 counts alleged that before the National Fireproofing Company received and unloaded the cars respectively referred to in the counts separately the railroad company did "constructively place" said cars in its yards in Detroit, and did notify the National Fireproofing Company accordingly. Testimony to establish this "constructive" placement was objected to, but was admitted and exceptions taken. The schedules, so far as I can see, contain no clause to justify the claims or the allegations of constructive placements. Nothing like it was, under the law, an element of the offenses charged in the 12 counts. These allegations and this testimony were alike impertinent and immaterial because of that fact, and proof of "constructive" placements was not warranted by anything

in the rules, schedules or tariffs. This testimony, I think, was wrongly admitted, and was prima facie incompetent. Nothing was disclosed to overcome this prima facie condition of incompetency. Furthermore, the law does not seem to me to have made criminal a mere congestion of freight traffic in large cities or elsewhere. It does require the prompt making and collecting of demurrage charges as they accrue in order to prevent unlawful concessions in rates for transportation, but this is very different from congestions or embargoes. While as to such demurrage charges and concessions the allegations of the several counts are pertinent and sufficient and proof respecting them plainly admissible, it was not so as to the immaterial allegations of congestions and constructive placements of cars for unloading—those mere acts not being criminal nor lawful elements of the offenses charged. An immaterial allegation in an indictment can afford no sound basis for the introduction of testimony to support it.

Possibly the errors I have referred to in respect to testimony did not influence the jury more than they did the trial judge, who appears to me to have inflicted an excessive penalty as a direct result of those errors. This seems apparent when we read what he said when imposing the sentence. The record shows that he then said:

"It is true that the penalty fixed by this statute is a very heavy one. The minimum is, heavier than almost any other criminal statute fixes that I have anything to do with; and the maximum is correspondingly high. The ordinary small fine in matters of this kind would be too trifling to consider in connection with the magnitude of the offense in dollars and cents. I have already interpreted the law to mean that (and this is my honest belief) moral turpitude and intentional wrongdoing have nothing to do with it. The result that follows the congestion is of a magnitude that one can hardly comprehend. This case was a revelation to me as to the awful results following congestion. Thousands of cars are held that cannot be delivered, and of course millions of dollars of damage done to the public taken as a whole, the railroads, the shipping public, the consuming public, the purchasing public, and to every one. The results that follow misfortunes of this kind are enormous; they are of great magnitude. And it is a proposition of great magnitude; it is dealing with big things, with matters of great volume, and, in proportion, from a money standpoint, goes far beyond the ordinary affairs of life. They deal with millions instead of dollars and cents. So when we think about the subject-matter they are dealing with and the end meant to be accomplished, the penalty, as I see it, is entirely reasonable under the interpretation that I gave to it that intentional wrongdoing is not necessary."

The congestion he referred to may have been disastrous to individuals, but the charge against the defendant in the 12 counts under consideration was not really that of causing a "congestion," which, per se, was not unlawful, but that of failing to collect only a few days' demurrage on each of only 12 cars specified in the 12 counts—thereby making unlawful concessions in rates of transportation. He said that thousands of cars are held in such cases and that the misfortunes which follow were "enormous." The mere "congestion" which caused such results was not unlawful, and for that reason could not properly have been proved as an element of the offenses charged; and as the attempt to prove it had been made over the objections of the defendant it is well to say that the recent investigation of car service by the Interstate Commerce Commission developed that there is no statute, crim-

inal or otherwise, which is applicable to such a state of case. The learned judge spoke of the expense the government had incurred; but, while disclaiming a right or intent to punish for that, his remarks seem clearly to indicate that what had been shown while all the 60 counts were under hearing influenced him and evidently inflamed the penalties.

It seems to me, therefore, that, could this case come to be tried upon the 12 counts alone, and the testimony be confined to the legal offenses those counts actually charge, there could be a judgment rendered more nearly fitting the crimes charged, namely, mere noncollection of demurrage for a few days under circumstances indicating nothing like willful or wanton violations of the law, as, indeed, the learned court afterwards said was the fact. For these reasons, I think the judgment should be reversed for the errors pointed out. The case can then be retried in a different atmosphere and without the complications to which I have alluded. This, I believe, would be promotive of justice.

Of course I do not doubt that ordinarily the trial court may exercise the discretion the statute gives in determining between the lowest and the highest penalty prescribed; but where the court may not merely have done that, but may unconsciously have permitted other factors to intrude themselves, justice may require a correction of a wrong unintentionally done. I think there should be a reversal, with directions that will more strictly limit the investigation and testimony to the 12 counts in a way to avoid the errors pointed out.

## On Motion for Rehearing.

DENISON, Circuit Judge. The motion points out two errors in the opinion.

It was said that the indictment for granting a concession was dismissed while the indictment for not observing the tariff was prosecuted to the judgment against which the writ of error is directed. The names given to the indictments should have been reversed. The same count of each indictment recited in identical language the same facts, but the concluding paragraph of each count in one indictment alleged that the described offense was the giving of a concession, and in the other indictment alleged that the same facts constituted a failure to observe the tariff. We do not see that the erroneous recital in the opinion as to the name of the surviving indictment could possibly have been important.

By way of giving support to the conclusion already independently reached that the evidence on a certain point was undisputed, the opinion recited that the District Judge had so stated in his charge to the jury and that his statement had not been then challenged. The rehearing application points out that this statement by the District Judge was not in his charge to the jury, but in the course of giving his reasons for rejecting the evidence claimed by defendant to be vital. It is not said that, whenever the District Judge made the statement, his attention was then, or ever, distinctly directed to the point. In view of the use which the opinion made of this subject-matter, whatever error there was therein cannot be controlling.

The careful review now made of the whole record confirms the majority of the court in its conclusion that there was no dispute in the evidence, concerning the precise point upon which the opinion made the case turn.

It is also now said that the defendant was indicted for violating the demurrage tariff, but convicted of violating the cartage tariff. We think this a misapprehension. To a prosecution based on the demurrage tariff, the defendant interposed the cartage tariff, practically by way of confession and avoidance. Conceding that the demurrage had not been collected, it justified because an exception to the demurrage tariff had been created by the cartage tariff. We held that the proper application of the cartage tariff did not justify the alleged exception. This did not convict defendant of an offense not charged.

In other substantial respects, the application presents nothing not already fully considered. It is denied.